IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

Civil Action No. 7:24-cv-00316-M-RJ

| | |
|---|---|
| CRYSTAL BRIMER, OD, FAAO, | |
| Plaintiff/Counter Defendant, | |
| v. | ORDER |
| MDELITE LASER & AESTHETIC, LLC, | |
| Defendant/Counter Claimant. | |

This matter comes before the court on the Plaintiff/Counter Defendant Crystal Brimer's ("Brimer") motion for partial dismissal of Defendant/Counter Claimant MDElite Laser & Aesthetic, LLC's ("MDElite") Counterclaims [DE 14]. Brimer seeks dismissal of four of MDElite's seven counterclaims against her, including promissory estoppel, civil theft, replevin, and misappropriation of trade secrets, arguing the claims are alleged under the incorrect state law and/or fail to state claims for relief. MDElite counters that the choice-of-law provision in the parties' contract governs its contract-related tort claims and that it states plausible counterclaims for relief against Brimer. For the reasons that follow, Brimer's motion is denied.

I.  **Background**

    A.  **Counter Claimant's Factual Allegations**

    The following are relevant factual allegations (as opposed to statements of bare legal conclusions, unwarranted deductions of fact, or unreasonable inferences) made by MDElite in the operative Counterclaims (DE 11), which the court must accept as true at this stage of the proceedings pursuant to *Kashdan v. George Mason Univ.*, 70 F.4th 694, 700 (4th Cir. 2023).

MDElite is a medical technology company seeking to provide affordable access to advanced, light, laser, and radiofrequency technology to the aesthetic and vision industries. It regularly collaborates with practitioners in dermatology, plastic surgery, ophthalmology, and optometry to deploy such technologies. Brimer is a Doctor of Optometry and fellow of the American Academy of Optometry who owns a specialty dry eye clinic ("Dry Eye Institute").

On or about March 1, 2023, MDElite and Brimer entered into a Consulting Agreement (the "Agreement"). Under the Agreement, MDElite retained Brimer as an independent contractor, who was required to "perform the following Consulting Services for [MDElite] pursuant to the terms and conditions of the Consulting Agreement":

[a] Direct the development of clinical strategies and plans to further integrate MDElite into the Vision market;

[b] Orchestrate and manage clinical aspects of regulatory strategies and interactions with Health Authorities including the FDA;

[c] Oversee the analysis and interpretation of clinical trial data and reporting clinical trial results;

[d] Lead interactions with academic thought leaders, investigators, and cooperative groups;

[e] Provide clinical support and work with other members of the management team to develop and communicate the overall corporate strategy;

[f] Represent [MDElite] and its programs to external audiences, including the investment, medical and regulatory communities, as well as industry collaborators/partners . . .;

[j] Provide lectures and webinars involving [MDElite] products to optometrists throughout the year, as outlined in Exhibit B;

[k] Be reasonably available to address quick pre-sale, one off reach outs from doc[tor]s . . .;

[m] 1-2 strategy calls monthly (marketing, legal, product development, doctor messaging); [and]

2

[n] Pre-record social media and testimonial videos/allow use of [Crystal Brimer] name and [Dry Eye Institute] . . . .

In addition to these services listed in the Counterclaims, the Agreement also required that Brimer "lead[] and supervis[e] clinical research" and "have direct line responsibility for Clinical Operations" for which she would "[p]rovide technical advice, development expertise[,] and advice regarding the evaluation of [MDElite's] products, prototypes, designs, and procedures." DE 11-1 at 4.[1]

Brimer agreed that "[a]ll services will be performed to the best of her ability and in a timely, competent, and professional manner." The Consulting Services provision further permitted the "[u]se of Crystal Brimer, OD and Dry Eye Institute (DEI) name[s] in MDElite marketing, with prior review and written authorization by [Brimer] on each marketing piece." In exchange, MDElite agreed to compensate Brimer as set forth in Exhibit B to the Agreement, including payments for attending certain events, for every device Brimer sold, and for a percentage of MDElite's annual gross revenue.

Under the Agreement, Brimer was to submit invoices to MDElite within twenty-one (21) days of the quarter in which she incurred expenses and to include the Consulting Services she performed that quarter. To assist Brimer in performing her Consulting Services, MDElite loaned her two (2) iProX devices, one (1) SculptPro device, and one (1) iLightPro device (the "Devices"). Under Paragraph Four of the Agreement, any Work Product arising out of or resulting from the Consulting Services was to remain MDElite's property and did not belong to Brimer:

---

[1] The court may "consider a 'written instrument' attached as an exhibit to a pleading, *see* Fed. R. Civ. P. 10(c), 'as well as [documents] attached to the motion to dismiss, so long as they are integral to the complaint and authentic.'" *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)). No party disputes that the Agreement, a copy of which is attached to the Counterclaims, is integral to the pleading and authentic.

> Ownership of Work Product. "Work Product" shall mean any products or publications solely or jointly conceived, developed, or reduced to practice by [Brimer] which arise out of or result from the Consulting Services rendered under this Agreement. Any Work Product jointly conceived, developed, or practiced by [MDElite] and [Brimer], specific to this agreement, shall remain the property of the [MDElite]. Contractor agrees that Work Product is and shall be work made for hire to the full extent permitted by law, with all intellectual property rights in the Work Product owned by [MDElite]. To the extent that Work Product does not qualify as work made for hire under applicable law, Contractor irrevocably transfers, assigns, and conveys to [MDElite] all rights, title, and interest in and to the Work Product.

In addition, Paragraph Five prevents the parties from disclosing any Confidential Information, which includes information and/or trade secrets relating to the party's management, business, operations, technology, products, or business plans for the term of the Agreement and for a period of three (3) years thereafter. Paragraph Five provides:

> Confidentiality. The parties agree that during the Term of this Agreement and any subsequent extensions, and for a period of three (3) years thereafter, the parties shall not disclose without the prior written consent of the non-disclosing party any Confidential Information. "Confidential Information" means information and/or trade secrets relating to the party's management, business, operations, technology, products, or business plans, which either party knows or has reason to believe is regarded as confidential by the other party and includes without limitation Work Product. Confidential Information shall not include information that (i) has become part of the public domain other than through breach of this Agreement, (ii) either party knew prior to its disclosure to the other party, or (iii) was learned from a third-party source having no duty of confidentiality to the party. Nothing in this section or Agreement shall be read to prevent [Brimer] from lecturing upon, disseminating, or publishing scientific papers arising from the Consulting Services performed for [MDElite]. [Brimer] shall give appropriate credit to [MDElite] in any publication directly related to jointly conceived Work Product.

Paragraph 14 of the Agreement further provides, "This Agreement shall be governed by the laws of the State of Minnesota without regard to conflict of laws rules."

MDElite alleges that, between March 2023 and November 2023, Brimer failed to perform all the Consulting Services in a timely, competent, and professional manner, as agreed. These failures include, but are not limited to:

> a. Brimer was not reasonably available to address "one off reach outs" from doctors.

4

b. Brimer did not make herself available for strategy and sales calls and other promotional activities. MDElite's sales team arranged for multiple sales calls to take place between Brimer and MDElite's clients and business prospects, but Brimer was difficult to reach and often unable to attend the sales calls, causing MDElite to lose sales. When Brimer did attend sales calls with MDElite's clients and business prospects, Brimer frequently suggested to MDElite's clients and business prospects that they needed additional devices that MDElite could not supply. These suggestions caused confusion and concern for MDElite's clients and business prospects, causing MDElite to lose sales.

c. Brimer was nonresponsive or slow to respond to requests from MDElite's marketing partner.

d. The quality of Brimer's presentations to the medical community relating to the Dry Eye Institute and MDElite's products were subpar, underwhelming, and resulted in MDElite receiving negative feedback from those who attended.

e. During the MDElite Sale Representative Training Webinar, Brimer was woefully unprepared and frequently left the Webinar screen during the Webinar.

f. During Brimer's Dry Eye Institute virtual training session, Brimer was unprepared, used outdated material, and was late or absent for significant periods of time. After the training session, MDElite's clients provided negative feedback.

Brimer also allegedly failed to perform her clinical guidance obligations. For example, Brimer provided no clinical support to MDElite after she began using MDElite's Devices and never reported the Devices' performance to MDElite. Rather than learning about the Devices' performance through Brimer, MDElite had to resort to learning about its Devices' performance through word of mouth or social media. Additionally, MDElite believes that Brimer shared Confidential Information relating to MDElite's business strategies with MDElite's business competitors.

On December 28, 2023, MDElite expressed to Brimer via letter its belief that she had breached the Agreement. Brimer did not respond; thus, on January 8, 2024, counsel for MDElite sent a follow-up letter regarding Brimer's alleged breaches, suggesting the parties (1) enter a new agreement or (2) discontinue working together. By letter dated January 22, 2024, Brimer

5

terminated the agreement by rejecting MDElite's offer to continue working together and demanded that MDElite cease and desist using Brimer's name, image, and likeness in MDElite's marketing materials. MDElite complied and removed all references in its marketing materials.

The four Devices loaned to Brimer are MDElite's proprietary property. One of the Devices, the SculptPro, has been cleared by the Food and Drug Administration ("FDA") but has not been cleared for distribution by MDElite and, therefore, can be used only as part of MDElite's clinical assessment protocol.

After the Agreement was terminated, on February 2, 2024, MDElite sent Brimer a formal notice that MDElite would collect MDElite's four Devices, and requested that it be allowed to retrieve the Devices during the week of February 12, 2024. Brimer responded, disclaiming any obligation to return the Devices.

On February 12, 2024, MDElite sent a second letter to Brimer demanding the immediate return of the four Devices. The four Devices carry a combined value of $200,000.00. Despite the termination of the parties' relationship and MDElite's multiple demands for possession, Brimer continued to refuse to return the Devices. MDElite believes that Brimer continues to use and profit from MDElite's four Devices and is creating Work Product with the Devices.

**B.    Procedural History**

On February 26, 2024, Brimer filed this action in New Hanover County Superior Court, alleging breach of contract and requesting a declaratory judgment or, in the alternative, monetary damages and attorney's fees. DE 1-1. MDElite removed the action to this court on March 28, 2024, invoking the court's diversity jurisdiction. DE 1. On April 4, 2024, MDElite filed the operative Answer and Counterclaims, in which it alleges claims for breach of contract, promissory

6

estoppel, unjust enrichment, and conversion, and for civil theft, replevin, and misappropriation of trade secrets under Minnesota statutory law.  DE 11.

Brimer filed the present motion seeking dismissal of four counterclaims—promissory estoppel, civil theft, replevin, and misappropriation of trade secrets—arguing that, under North Carolina's choice-of-law rules, the claims are pled under the incorrect law (i.e., they should be pled under North Carolina law), and/or they fail to state plausible claims for relief.

MDElite agrees that the court must apply North Carolina's choice-of-law rules and counters that its "contract-related" counterclaims are properly pled under Minnesota law in accordance with the "broad" choice-of-law provision in the Agreement.  MDElite argues that "[b]ecause Dr. Brimer and MDElite's relationship is established by the Consulting Agreement and therefore does not exist outside of the Agreement, any actions or omissions by Dr. Brimer arise under the Consulting Agreement and are governed by Minnesota law." DE 25 at 5.  Alternatively, MDElite asserts that discovery is necessary to determine factual issues, such as whether the counterclaims are related to the Agreement, where the Agreement was formed, and where the injur(ies) occurred.

Brimer replies that MDElite's contention—that its counterclaims should survive this motion because they essentially "do not allege sufficient facts to establish that Minnesota law does not apply"—fails to acknowledge MDElite's burden under Rule 8 of the Federal Rules of Civil Procedure to state plausible claims for relief, including facts sufficient to establish that the claims are permitted by the applicable choice-of-laws analysis. DE 28 at 1; *see also id.* at 8-9 ("MDElite cannot hide behind the vagueness of its pleadings on the choice-of-law issue and simultaneously survive the *Iqbal* pleading standard").  Further, Brimer contends that MDElite primarily relies on cases that do not apply North Carolina choice-of-law rules and that, if MDElite persists in its

7

argument that the non-contractual counterclaims "bear a close relationship to the Agreement," then the economic loss rule would bar the claims. Finally, Brimer argues that the allegations support a finding that North Carolina law applies and/or that MDElite fails to state plausible claims for relief.

## II. Legal Standards

When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all of the well-pleaded factual allegations contained within the pleading and must draw all reasonable inferences in the claimant's favor, *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017), but any legal conclusions proffered by the claimant need not be accepted as true, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The *Iqbal* Court made clear that "Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79.

To survive a Rule 12(b)(6) motion, the claimant's well-pleaded factual allegations, accepted as true, must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). *Twombly*'s plausibility standard requires that a claimant's well-pleaded factual allegations "be enough to raise a right to relief above the speculative level," i.e., allege "enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal [conduct]." *Id.* at 555–56. A speculative claim resting upon conclusory allegations without sufficient factual enhancement cannot survive a Rule 12(b)(6) challenge. *Iqbal*, 556 U.S. at 678–79 ("where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged--but it has not 'show[n]'--'that the pleader is entitled to

8

relief.'" (quoting Fed. R. Civ. P. 8(a)(2)); *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) ("'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line between possibility and plausibility of entitlement to relief.'" (quoting *Twombly*, 550 U.S. at 557)). Courts must draw all reasonable inferences in favor of the claimant. *Alberti v. Rector & Visitors of the Univ. of Virginia*, 65 F.4th 151, 154 n.3 (4th Cir. 2023) (citing *Kensington Volunteer Fire Dep't v. Montgomery Cnty.*, 684 F.3d 462, 467 (4th Cir. 2012)).

III. **Analysis**

As previously stated, subject-matter jurisdiction for this case is based on diversity of citizenship of the parties. *See* 28 U.S.C. § 1332. Federal courts sitting in diversity must apply the substantive law of the forum state, including its choice-of-law rules. *Small v. WellDyne, Inc.*, 927 F.3d 169, 173 n.3 (4th Cir. 2019); *see also Kenney v. Indep. Order of Foresters*, 744 F.3d 901, 905 (4th Cir. 2014). Typically, the proper choice-of-law analysis in North Carolina varies depending on how a claim is characterized: "[c]hoice of law in contracts cases is governed by the rule of *lex loci contractus* [or, where the contract was formed], *see Tanglewood Land Co. v. Byrd*, 299 N.C. 260, 261 S.E.2d 655, 656 (1980), and choice of law in torts cases is governed by the rule of *lex loci delicti* [or, where the injury occurred] *see Boudreau v. Baughman*, 322 N.C. 331, 368 S.E.2d 849, 854 (1988)." *Caper Corp. v. Wells Fargo Bank, N.A.*, 578 F. App'x 276, 280 (4th Cir. 2014). Relevant here, when the contracting parties have agreed "that a given jurisdiction's substantive law shall govern the interpretation of the contract, such a contractual provision will be given effect." *Byrd*, 299 N.C. at 262, 261 S.E.2d at 656.

A. **Choice of Law**

In this case, no party disputes that, under the governing choice-of-law provision, the claims for breach of contract are governed by Minnesota law. The parties also agree that North Carolina's

9

choice-of-law rules apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) ("The conflict of laws rules to be applied by the federal court in [North Carolina] must conform to those prevailing in [North Carolina's] state courts."); *see also Synovus Bank v. Coleman*, 887 F. Supp. 2d 659, 669 (W.D.N.C. 2012) ("A choice-of-law provision in a contract generally requires use of a certain state's substantive law, not the state's conflict of laws principles.") (citing *Johnston County v. R.N. Rouse & Co.*, 331 N.C. 88, 92, 414 S.E.2d 30, 33 (1992)).

The parties differ, however, as to which law applies to four of MDElite's seven counterclaims: Brimer contends that North Carolina law applies to the four challenged claims, but MDElite asserts that the claims arise from the Agreement and, thus, are governed by the Agreement's choice-of-law provision, which requires application of Minnesota law. Before analyzing which law applies, the court must first characterize the nature of the challenged claims. *See Synovus Bank*, 887 F. Supp. 2d at 668 (citing *Simms Inv. Co. v. E.F. Hutton & Co.*, 688 F. Supp. 193, 197 (M.D.N.C. 1988) for the proposition that "[i]n a conflict of laws situation, a court must determine at the outset whether the problem presented to it for resolution relates to torts, contracts, property, or some other field, or to a matter of substance or procedure, in order to refer to the appropriate law.").

### 1. Nature of the Claims

MDElite relies, in substantial part, on the decision in *Hitachi Credit America Corporation v. Signet Bank*, 166 F.3d 614 (4th Cir. 1999), to argue that the choice-of-law provision in the subject Agreement should extend to the four challenged counterclaims. In *Hitachi*, like here, the pleading alleged both contract and tort claims; however, the tort in *Hitachi* alleged fraudulent inducement to enter the contract. *Id.* at 620, 623. Also, the choice-of-law provision in the subject contract "explicitly call[ed] for the application of Virginia law in the interpretation of '[the]

10

Agreement and the rights and obligations of the parties [t]hereunder . . . including all matters of construction, validity and performance.'" *Id.* at 624. The Fourth Circuit "recogniz[ed] the close relationship of the tort claims to the contract" (*id.* at 628) and "concluded that Virginia law applied to the fraud claims, reasoning that the choice-of-law language in the contract 'indicate[d] that the parties intended to cover more than merely contract claims.'" *Pasternak & Fidis, P.C. v. Recall Total Info. Mgmt., Inc.*, 95 F. Supp. 3d 886, 895 (D. Md. 2015) (quoting *Hitachi*, 166 F.3d at 628).

MDElite contends that the challenged counterclaims bear a close relationship to the Agreement. Brimer counters that *Hitachi* and MDElite's other cited cases do not apply North Carolina choice-of-law rules and, thus, are not applicable. While true that *Hitachi* and some of its progeny do not apply North Carolina rules, the court finds these courts' analyses instructive, particularly here where the North Carolina Supreme Court has not spoken on the issue.

In evaluating the nature of the challenged tort claims, *Hitachi* and its progeny focus on whether the claims are "closely related" to the contract at issue. *See, e.g., Pasternak & Fidis, P.C.*, 95 F. Supp. 3d at 895 (noting that the fraudulent inducement claim found to be covered by the choice-of-law provision in *Hitachi* "called into question the validity of the entire contract"); *Volvo Grp. N. Am., LLC v. Forja de Monterrey S.A. de C.V.*, No. 1:16-CV-114, 2019 WL 4919632, at *5 (M.D.N.C. Oct. 4, 2019) (same). Here, MDElite argues, and the court agrees, that discovery is necessary to determine whether the claims are "closely related."

Before examining the tort claims, the court notes first that one of the challenged counterclaims is, by nature, "contract related": promissory estoppel. *JTH Tax, Inc. v. Aime*, 744 F. App'x 787, 792 (4th Cir. 2018) (characterizing the doctrine of promissory estoppel as a "contract-related theory."). Such claim is typically alleged in the alternative to a breach of contract claim, in the event the contract may be deemed void or otherwise unenforceable. Here, MDElite

11

alleges its promissory estoppel claim in the alternative to its breach of contract claim and seeks recovery for two promises allegedly made by Brimer: (1) to perform Consulting Services for MDElite in a timely, competent, and professional manner ("services promise"); and (2) to return the four Devices loaned to her by MDElite at the end of the parties' relationship ("devices promise"). Countercl. ¶ 51.

For purposes of this analysis, the court must determine not whether the challenged claims are merely "contract related," but whether they are related to the contract *at issue*. *See Volvo Grp. N. Am.,* 2019 WL 4919632, at *5. In this case, the court finds that the "services promise" portion of MDElite's promissory estoppel claim clearly relates to the subject Agreement, which delineates the services Brimer agreed to perform in exchange for compensation as consideration. *See* DE 11-1. The "devices promise" portion of the claim, however, is not as clear; nothing in the Agreement *specifically* references any loan or other transaction between Brimer and MDElite involving MDElite's "devices." *See id.*

However, the Consulting Services section of the Agreement required that Brimer "lead[] and supervis[e] clinical research" and "have direct line responsibility for Clinical Operations" for which she would "[p]rovide technical advice, development expertise[,] and advice regarding the evaluation of [MDElite's] *products, prototypes, designs, and procedures*." DE 11-1 at 4 (emphasis added). In addition, Brimer was directed to "[p]rovide lectures and webinars involving [*MDElite's*] *products* to optometrists throughout the year." *Id.* (emphasis added). These required services imply not only that Brimer would need to obtain, employ, and share knowledge of MDElite's "products, prototypes, designs, and procedures," but also that the loaned "devices" either included such products or prototypes, or, at least, assisted Brimer with research, clinical operations, and/or education. The court finds that MDElite's allegations raise factual questions

12

requiring further development about whether its promissory estoppel claim involving the devices promise is closely related to the Agreement.

The same is true for the tort counterclaims of civil theft and replevin, which also seek recovery for MDElite's alleged injuries from Brimer's failure or refusal to return the loaned devices. Questions exist as to whether the devices constitute the same "products" or "prototypes" described in the Agreement, whether MDElite loaned Brimer the devices to assist her with performing with the Consulting Services, and whether Brimer, in fact, used the loaned devices to perform such services. These questions require further factual development before the court can determine whether the counterclaims are closely related to the Agreement.

Finally, like the civil theft and replevin claims, misappropriation of trade secrets is a tort claim and, in this case, involves Brimer's alleged continued use of MDElite's devices after termination of the Agreement. The claim seeks recovery for injuries stemming from "work product" generated by Brimer through such use, which purportedly belongs to MDElite, and from Brimer's failure to return such work product to MDElite and/or her improper dissemination of it to competitors. Countercl. ¶¶ 79-86. MDElite alleges that "Brimer was permitted to use the SculptPro as part of MDElite's clinical assessment protocol and [she] reported results to MDElite as part of MDElite's clinical testing" and that "[a]ll data and information related to patient experience with the Devices, including the SculptPro, is Work Product which shall remain the property of MDElite pursuant to the Agreement." *Id.* ¶¶ 80-81. In addition to the Consulting Services described above, the Agreement provides that Brimer agreed to "[o]versee the analysis and interpretation of clinical trial data and the reporting [of] clinical trial results." DE 11-1 at 3. Taking the allegations as true, the court may reasonably infer that Brimer used the SculptPro, leant to her by MDElite, to perform the clinical trial service, as well as possibly the evaluation and

13

education services involving this and other of MDElite's products. However, these are questions requiring further factual development to determine whether the misappropriation claim is "closely related" to the Agreement. *See Movement Mortg., LLC v. McDonald*, No. 317CV00716RJCDSC, 2018 WL 6733953, at *3 (W.D.N.C. Nov. 6, 2018), *report and recommendation adopted*, No. 317CV00716RJCDSC, 2019 WL 452773 (W.D.N.C. Feb. 5, 2019) ("A choice of law inquiry may be very fact intensive and more appropriately undertaken after the record is sufficiently developed.") (citing *Terry v. Swift Transp.*, No. 1:16cv256, 2017 WL 1013074, at *7 (M.D.N.C. March 14, 2017)).

### 2. Scope of Choice-of-Law Provision

In determining which law to apply in a conflicts of law scenario, courts examine not only the nature of the claims, but also the language of the choice-of-law provision to determine whether it is broad enough to encompass non-contractual claims. Here, the choice-of-law provision states, "This Agreement shall be governed by the laws of the State of Minnesota without regard to conflict of laws rules." Agreement, ¶ 14, DE 11-1. This provision is nearly identical to at least two provisions analyzed by courts in North Carolina. In *NC & VA Warranty Co., Inc.*, the court distinguished a very similar choice-of-law provision from that in *Hitachi*, finding it was "not as broad" and did not cover the related tort claims. No. 15-80016, 2016 WL 6658968, at *6 (Bankr. M.D.N.C. Sept. 28, 2016) (examining a provision stating, "[t]his Agreement shall be subject to and governed by the laws of the State of Ohio"); *see also Pasternak & Fidis, P.C.*, 95 F. Supp. 3d at 895 (finding no indication in the provision's language—"[t]his Agreement shall be governed by the laws of the State of Georgia, without regard to its principles or conflicts of law"—that the parties intended it to cover more than contract claims). Conversely, the court in *Dash BPO, LLC v. Lindberg*, noting that the issue is "unsettled," determined that a similar provision was

14

"sufficiently broad to encompass contract-related tort claims," and applied Illinois law to a fraudulent concealment claim. No. 5:20-CV-625-FL, 2022 WL 107106, at *5 n.6 (E.D.N.C. Jan. 11, 2022), *aff'd*, No. 22-1146, 2024 WL 2874282 (4th Cir. June 7, 2024) (examining provision stating the agreement "shall be governed and construed in accordance with the internal laws of the State of Illinois").

Mindful that courts differ as to the scope of nearly identical provisions, this court finds persuasive the decision in *Volvo Group, supra*. In that case, the court was asked to determine at the pleadings stage, *inter alia*, whether a choice-of-law provision in a purchase agreement, stating that the agreement "shall be governed by and construed in accordance with the laws of the state of New York," was sufficiently broad to cover a claim of fraudulent inducement. 2019 WL 4919632, at *3-4.[2] At the outset, the *Volvo Group* court noted that "North Carolina has not addressed this precise question" and, thus, it "must predict how it believes the North Carolina Supreme Court would rule in an appropriate case." *Id.* at *4. After a lengthy analysis of the different approaches taken by courts both in and outside North Carolina to the issue, the *Volvo Group* court concluded that its "discussion reveal[ed] a consistent theme: fidelity to the contracting parties' intent," and found that the best way to give effect to the parties' intent in that case was to construe the choice-of-law provision as encompassing the tort claim. *Id.* at *5 (citing *Duke Power Co. v. Blue Ridge Elec. Membership Corp.*, 117 S.E.2d 812, 816 (N.C. 1961)). This court agrees with the approach,[3] and will attempt to determine the parties' intent in this case by examining both the choice-of-law provision and the counterclaims themselves. *See Hitachi*, 166 F.3d at 628 ("[w]here a choice of

---

[2] Importantly, the *Volvo Group* court did not simply accept the parties' stipulation as to the applicable law, but engaged in a comprehensive evaluation of whether the subject choice-of-law provision governed the challenged tort claim. *See id.*

[3] The parties have cited no recent opinions in North Carolina, and the court has performed its own research to find that North Carolina has not yet ruled on the precise question at issue here.

15

law clause . . . is sufficiently broad to encompass contract-related tort claims such as fraudulent inducement," courts may "honor[ ] the intent of the parties to choose the applicable law.").

The choice-of-law provision in this case specifies that "[*t*]*his Agreement* shall be governed by the laws of the State of Minnesota." Agreement, ¶ 14 (emphasis added). Thus, to the extent that the challenged counterclaims arise from and are related to the terms of the Agreement, the court may reasonably conclude the parties intended that conduct performed under the Agreement would be governed by the choice-of-law provision. *Volvo Grp.*, 2019 WL 4919632 at *5. As set forth above, the court finds based on the counterclaims' allegations and the language of the Agreement that factual development is needed on issues such as whether the loaned devices constitute (some of) the "products" or "prototypes" listed in the Agreement; whether the devices were meant to assist Brimer in performing the Consulting Services listed in the Agreement; whether Brimer, in fact, used the devices to perform some listed services, such as clinical research, operations, and education. These "unknowns" lead the court to conclude that discovery is necessary to determine whether the counterclaims arise and are related to the Agreement's terms and, thus, whether the choice-of-law provision governs the challenged counterclaims. *Cf. Synovus Bank*, 887 F. Supp. 2d at 669 ("[T]he scope of the choice-of-law provision contained in the Note is limited to disputes arising under the terms of that specific document. It does not dictate the choice of law applicable to all disputes between the parties.").

Notably, the Fourth Circuit, in determining whether a party waived a choice-of-law defense, recently stated:

> [D]etermining what law applies to a particular claim is often a fact-intensive undertaking. *See, e.g., Kenney v. Indep. Order of Foresters*, 744 F.3d 901, 907–08 (4th Cir. 2014) (stating that "the proper choice-of-law approach" is a "fact-intensive area"). Parties therefore may not be able to make appropriate and persuasive choice-of-law arguments without the benefit of discovery. District courts in this Circuit thus regularly defer choice-of-law issues until after the parties have

completed discovery. *See, e.g., Morris v. Bank of Am.*, 3:18-cv-00157-RJC-DSC, 2019 WL 1421166, at *3 (W.D.N.C. Mar. 29, 2019) (declining to decide choice-of-law issue until record was developed); *Anderson Gustafsson Advokatbyra, KB v. eScrub Sys., Inc.*, Civil Action No. 1:10-cv-632, 2011 WL 677053, at *2 (E.D. Va. Feb. 15, 2011) ("The Court finds that the choice of law for tort and contract based claims should be determined with the benefit of a more complete record pending discovery."); *Malinowski v. Lichter Grp., LLC*, Civil No. WDQ-14-917, 2015 WL 1129522, at *4 (D. Md. Mar. 11, 2015) (declining to resolve choice-of-law issue at motion-to-dismiss stage because its "fact-intensive" and "context specific" inquiry made it appropriate to defer "until after the parties have engaged in discovery" (citation omitted)). We agree that this approach will often be the best course . . . .

*M.D. Russell Constr., Inc. v. Consol. Staffing, Inc.*, No. 22-1420, 2023 WL 8798086, at *3 (4th Cir. Dec. 20, 2023); *see also Design Res., Inc. v. Leather Indus. of Am.*, 900 F. Supp. 2d 612, 621 (M.D.N.C. 2012) ("In light of the fact that a substantive dispute remains as to the application of North Carolina or Washington law, this court finds that resolution of the motion to dismiss the remaining claims should be deferred to trial."). The court concludes that discovery is necessary to determine which law applies to the challenged counterclaims before it can determine whether the allegations state plausible claims for relief.

### B.    Failure to State Plausible Claims for Relief

Brimer argues that, notwithstanding which law applies, MDElite fails to allege facts necessary to support a plausible misappropriation claim, in that it fails to allege the existence of a trade secret and that Brimer used and disclosed the trade secret. The counterclaim is pled under the Minnesota Uniform Trade Secrets Act, Minn. Stat. § 325C.01M, *et seq.* ("MUTSA"), which requires that MDElite sufficiently allege "(1) trade secrets and (2) that its trade secrets were misappropriated." *Am. Achievement Corp. v. Jostens, Inc.*, 622 F. Supp. 3d 749, 764 (D. Minn. 2022).

### 1.    Existence of a Trade Secret

The MUTSA defines a trade secret as information that:

17

(i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

(ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Minn. Stat. § 325C.01, subd. 5. "Information which is generally known to the public or within an industry, or is readily ascertainable, is not a trade secret." *Katch, LLC v. Sweetser*, 143 F. Supp. 3d 854, 868 (D. Minn. 2015). Notably, a claimant "need not allege the nature of the trade secrets with specificity at the pleading stage, but must describe them with more than conclusory statements and with 'sufficient information to infer more than a mere possibility of misconduct.'" *Am. Achievement Corp.*, 622 F. Supp. 3d at 764 (citation omitted).

MDElite alleges that "Brimer was permitted to use the SculptPro as part of MDElite's clinical assessment protocol and reported results to MDElite as part of MDElite's clinical testing"; "[a]ll data and information related to patient experience with the Devices, including the SculptPro, is Work Product which shall remain the property of MDElite pursuant to the Agreement"; "[t]he Agreement also includes a Confidentiality provision, which requires that such Work Product must remain confidential"; and "[t]he Work Product generated through use of the Devices is a trade secret because it is not generally known or readily ascertainable, it provides a competitive advantage, has been developed at MDElite's expense, and MDElite intended to keep it confidential." Countercl. ¶¶ 80-83. Taking them as true, the court finds these allegations, supported by the attached Agreement, sufficient to state a trade secret under the MUTSA.

Brimer cites three cases, arguing that MDElite's allegations are insufficient to state a trade secret. DE 15 at 18; DE 28 at 10. The court finds these cases distinguishable. First, in *Hot Stuff Foods, LLC v. Dornbach*, the court determined that the plaintiff's allegations merely concluded and failed to "set forth facts showing that the information [e.g., business plans, pricing, margins,

18

and sales strategies] had independent economic value due to its secrecy, was not readily ascertainable by others[,] and that Hot Stuff took efforts to maintain its secrecy." 726 F. Supp. 2d 1038, 1044 (D. Minn. 2010). Likewise, in *CHS Inc. v. PetroNet, LLC*, the court found on summary judgment that the plaintiff failed "to explain what the allegedly secret processes reflected in these documents [e.g., "those memorializing the 'as is' operations and business rules of the company, flowcharts depicting business processes, and 'critical' process documents providing a 'road map' to the software"] are, instead giving only general categories and a few specific examples of the documents it claims are trade secrets." No. CIV. 10-94 RHK/FLN, 2011 WL 1885465, at *8 (D. Minn. May 18, 2011). Finally, in *Medafor, Inc. v. Starch Medical Inc.*, the court found allegations describing trade secrets as, "business methodologies, formulas, devices, and compilations of information, including suppliers and customers...." to be "so broad as to be meaningless." No. 09-CV-0441 PJS/FLN, 2009 WL 2163580, at *1 (D. Minn. July 16, 2009).

Conversely, in this case, MDElite alleges that it paid Brimer to generate the trade secrets in the form of Work Product—i.e., data and information gathered from patient experiences with the SculptPro—which, under the valid and enforceable Agreement, the parties agreed would remain confidential and solely the property of MDElite. The court finds these allegations sufficient to allege the existence of a trade secret under Minnesota law. *See Protege Biomedical, LLC v. Z-Medica, LLC*, 394 F. Supp. 3d 924, 939 (D. Minn. 2019) ("Protégé alleges that it developed various trade secrets while researching and creating its inventions," which, if made public, "would undermine Protégé's competitive advantage in the industry.").

### 2. Misappropriation

"Misappropriation," is the "acquisition," "disclosure," or "use[ ]" of another's trade secrets by improper means. *Am. Achievement Corp.*, 622 F. Supp. 3d at 765 (quoting Minn. Stat. §

19

325C.01, subdiv. 3). Improper means are "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* (quoting Minn. Stat. § 325C.01, subdiv. 2). "[A]lthough exacting specificity is not required at the pleading stage, a plaintiff [ ] must allege that the defendant disclosed, acquired, or used some particular trade secret in an improper manner." *CH Bus Sales, Inc. v. Geiger*, No. 18-CV-2444 (SRN/KMM), 2019 WL 1282110, at *9 (D. Minn. Mar. 20, 2019) (citations omitted).

Here, MDElite alleges that Brimer caused harm when, "[u]pon information and belief, Dr. Brimer shared MDElite's business strategy and business plans with MDElite's competitors." Countercl. ¶ 86; *see also id.* ¶ 29 ("upon information and belief, Dr. Brimer shared Confidential Information relating to MDElite's business strategies with MDElite's business competitors."). MDElite also alleges that "[d]espite the termination of the parties' relationship," Brimer retained the devices "disclaiming any obligation to return the devices," and "continues to use and profit from MDElite's four Devices and is creating Work Product with the Devices. Such Work Product, and any profit derived therefrom, belongs solely to MDElite." *Id.* ¶¶ 38, 42-43.

Brimer contends that MDElite's allegations are insufficient, because "mere fears" a person "*might* have taken (completely undefined) trade secrets" and "*might* use these trade secrets to their advantage" do not give rise to a plausible claim under Minnesota law. DE 15 at 19 (citing *CH Bus Sales*, 2019 WL 1282110, at *10) (emphasis in original). Brimer asserts that MDElite "fails to specify *how* or *to whom* Plaintiff used or disclosed alleged trade secrets." DE 28 at 11 (citing *Coyne's & Co. v. Enesco, LLC*, 565 F. Supp. 2d 1027, 1045 (D. Minn. 2008) (emphasis in original).

Although a close call, the court finds MDElite's allegations sufficient to state a plausible MUTSA claim at this pre-discovery stage of the litigation. According to MDElite, Brimer refused to return the devices after two notices to collect and profited from them by continuing to use them

to create confidential Work Product; this raises a question as to whether Brimer perceived value in keeping and using the devices, although allegedly she had no right to do so, as set forth in the Agreement.

The court finds these allegations, taken as true, state a plausible claim for misappropriation, and they should proceed to discovery to flesh out whether Brimer acquired and used the confidential Work Product by improper means. *See, e.g., CH Bus Sales*, 2019 WL 1282110, at *10 (citing "recent decisions allowing a misappropriation claim past the motion to dismiss stage" including *Stratasys, Inc. v. Krampitz*, No. 17-cv-5524 (DSD/HB), 2018 WL 2247265, at *3-4 (D. Minn. May 16, 2018) (plaintiff alleged that defendant (a former employee) "sent [large amounts of] confidential information to his [own] email account and downloaded files to a portable USB," while still employed with plaintiff, and then "used [plaintiff's] confidential information and trade secrets to build his own competing [3D printing] business") and *Deluxe Fin. Servs., LLC v. Shaw*, No. 16-cv-3065 (JRT/HB), 2017 WL 3327570, at *2 (D. Minn. Aug. 3, 2017) (plaintiff alleged that defendant (a former employee) "retained over 740 [trade secret] files on his USB devices relating to [plaintiff's] longstanding customer," and then used this proprietary information to steal that customer from plaintiff during a head-to-head "RFP process")); *see also Am. Achievement Corp.*, 622 F. Supp. 3d at 765 (citing *Stratasys* and *Deluxe Fin. Servs.* and finding sufficient plaintiff's allegations that defendant asked plaintiff's former salespersons to share trade secrets with defendant in violation of restrictive covenants and that a former executive sent trade secret information to his personal email address and later shared the information with defendant).

IV.    **Conclusion**

When parties expressly agree to the application of substantive law to disputes arising under their agreement, it remains unclear in North Carolina whether such law applies to "closely related"

21

tort claims. In this case, the court finds that discovery is necessary to develop factual issues before determining which law applies to the challenged counterclaims, such as whether the devices MDElite loaned to Brimer constitute (some of) the "products" or "prototypes" listed in the Agreement; whether the devices were meant to assist Brimer in performing the Consulting Services listed in the Agreement; whether Brimer, in fact, used the devices to perform some listed services, such as clinical research, operations, and education. Moreover, the court concludes that MDElite alleges a plausible claim for misappropriation of trade secrets under Minnesota law, sufficient to proceed to discovery.

Accordingly, Brimer's motion for partial dismissal is DENIED.

SO ORDERED this 17th day of March, 2025.

RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE

22